**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ANDREW RENE DECOOK, JR.,

                Plaintiff,

vs.                                    Case No.  3:12-cv-1122-J-JRK

CAROLYN W. COLVIN,[1]
Acting Commissioner of Social Security,

                Defendant.

_____/

## OPINION AND ORDER[2]

### I.  Status

      Andrew Rene Decook, Jr. ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits ("DIB").  Plaintiff alleges disability based on severe back pain, degenerative disc disease, abnormal sacroiliac joint instability, anxiety, bipolar disorder, major depression, panic attacks, social anxiety disorder, and insomnia.  Transcript of Administrative Proceedings (Doc. No. 9; "Tr." or "administrative transcript"), filed January 28, 2013, at 43, 210, 225, 230-31, 241. On April 27, 2009, Plaintiff filed an application for DIB.  Tr. at 163-65.  Plaintiff alleged an onset disability date of November 12, 2008.  Tr. at 163.  Plaintiff's application was denied initially, see Tr. at 105-06, and was denied upon reconsideration, see Tr. at 110-11.

---

      [1]      Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

      [2]      The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 11), filed March 4, 2013; Reference Order (Doc. No. 12), entered March 5, 2013.

On January 20, 2011, an Administrative Law Judge ("ALJ") held a hearing at which Plaintiff and a vocational expert ("VE") testified.  Tr. at 38-91.  A non-attorney representative was present with Plaintiff at the hearing.  Tr. at 23, 50.  At the time of the hearing, Plaintiff was forty-four (44) years old.  Tr. at 45.  The ALJ issued a Decision on February 23, 2011, finding Plaintiff not disabled through the date of the Decision.  Tr. at 23-33.  On August 17, 2012, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, thereby making the ALJ's Decision the final decision of the Commissioner.  On October 15, 2012, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

Plaintiff alleges two errors by the ALJ.  <u>See</u> Plaintiff's Memorandum of Law in Support of his Position (Doc. No. 14; "Pl.'s Mem."), filed April 1, 2013.  Plaintiff challenges the ALJ's assignment of weight to the medical opinions in the administrative transcript and the ALJ's credibility determination of Plaintiff.  <u>See</u> Pl.'s Mem. at 10-18.  On May 30, 2013, Defendant filed a memorandum responding to Plaintiff's arguments and asserting that the Commissioner's final decision is supported by substantial evidence.  <u>See</u> Memorandum in Support of the Commissioner's Decision (Doc. No. 15) at 4-20.  After a thorough review of the entire record and consideration of the parties' respective memoranda, the Commissioner's final decision is due to be affirmed for the reasons stated herein.

## II.  The ALJ's Decision

When determining whether an individual is disabled[3], an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ followed the five-step sequential inquiry.  See Tr. at 25-32.  At step one, the ALJ observed that Plaintiff "has not engaged in substantial gainful activity since November 12, 2008, the alleged onset date."  Tr. at 25 (emphasis and citation omitted).  At step two, the ALJ found Plaintiff suffers from "the following severe impairments: degenerative disc disease, sacroiliac dysfunction and bipolar disorder."  Tr. at 25 (emphasis and citation omitted).  At step three, the ALJ ascertained Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. at 25 (emphasis and citation omitted).  The ALJ determined Plaintiff has the following residual functional capacity ("RFC"):

---

[3]     "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> [Plaintiff can] perform sedentary work as defined in 20 CFR 404.1567(a): during a normal 8-hour work day, he can lift/carry 10 pounds occasionally and less than 10 pounds frequently; he can sit for up to 6 hours and stand/walk for up to 2 hours; he has unlimited ability to perform push/pull functions with his extremities; he can frequently climb stairs and ramps, but not climb ropes, ladders or scaffolds, he can frequently balance, stoop, kneel or crawl and can occasionally crouch; he should not be exposed to extreme cold; he is limited to work that requires occasional interaction with the public and crowds.

Tr. at 26 (emphasis and citation omitted).

At step four, the ALJ found Plaintiff "is unable to perform any past relevant work." Tr. at 31 (emphasis and citation omitted). After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined at step five that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." Tr. at 31 (emphasis and citation omitted). These jobs include "surveillance systems monitor," "table worker," and "addresser[.]" Tr. at 32. The ALJ concluded Plaintiff "has not been under a disability . . . from November 12, 2008, through the date of th[e D]ecision." Tr. at 32 (emphasis and citation omitted).

### III.  Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as

-4-

adequate to support a conclusion.'" Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV.  Discussion

As noted above, Plaintiff raises two issues on appeal.  Each is addressed in turn.

## A.  Medical Opinions[4]

Plaintiff takes issue with the weight assigned to the medical opinions in the record. See Pl.'s Mem. at 10-15.  Specifically, Plaintiff claims that the ALJ failed to address the relevant factors in considering certain treating physician's opinions, and that the ALJ should have afforded those opinions controlling weight.  See id.

### 1.  Law Regarding Handling of Various Medical Opinions

The Regulations establish a "hierarchy" among medical opinions that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the

---

[4]        "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1513(a) (defining "[a]cceptable medical sources").

opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); see also 20 C.F.R. §§ 404.1527(e), 416.927(f).

With regard to a treating physician,[5] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering factors such as the length of treatment, the frequency of examination, the nature and extent of the

---

[5]     A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician.  Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records.  Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference.  See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted).  Similarly, the opinions of nonexamining physicians, taken alone, do not constitute substantial evidence.  Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)).  However, an ALJ may rely on a nonexamining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of a treating physician that is inconsistent with the evidence. Oldham, 660 F.2d at 1084.

An ALJ is required to consider every medical opinion.  See 20 C.F.R. §§ 404.1527(d), 416.927(d) (stating that "[r]egardless of its source, we will evaluate every medical opinion

we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981) (citation omitted); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); see also Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.

### 2.  Summary of Medical Opinions at Issue

#### a.  Treating Physicians

Four treating physicians rendered opinions: James McDonnell, M.D., Plaintiff's primary care physician; Mark Murphy, M.D., Plaintiff's neurosurgeon; Kevin Free, M.D., Plaintiff's pain management physician; and Arnold Graham Smith, M.D., Plaintiff's orthopedic surgeon.

<u>1.  Dr. McDonnell</u>

Dr. McDonnell treated Plaintiff since at least January 2007.  Tr. at 438.  Dr. McDonnell sent Plaintiff for an MRI of the lumbar spine on October 27, 2008, after Plaintiff reported back pain and right leg radiculopathy.  See Tr. at 248.  Based on the MRI, Dr. McDonnell diagnosed degeneration of lumbar intervertebral disc and referred Plaintiff to pain management.  Tr. at 312-13.

In a letter dated February 5, 2009, Dr. McDonnell opined that Plaintiff was unable to work.  Tr. at 274. Plaintiff had been a patient of Dr. McDonnell's for at least a few years, and Dr. McDonnell reached this conclusion based on Plaintiff's suffering from degenerative disc

disease along with neuroforaminal stenosis.  Tr. at 274.  Dr. McDonnell indicated that Plaintiff's condition causes pain, instability, decreased range of motion, and decreased sensation in both lower extremities.  Tr. at 274.  Dr. McDonnell opined that Plaintiff's condition is exacerbated by lifting, bending, or stooping, "making it difficult for [Plaintiff] to perform activities of daily living without considerable pain."  Tr. at 274.  Dr. McDonnell found the limitations caused by Plaintiff's condition make Plaintiff "unable to work without causing significant pain and risk of further injury," and it was foreseeable Plaintiff may be "unable to work for some time, possibly a full year."  Tr. at 274.

In addition to this letter, Dr. McDonnell filled out a Multiple Impairment Questionnaire on July 3, 2009, in which he gave a "fair" prognosis.  Tr. at 275.  Dr. McDonnell rated Plaintiff's pain as moderately severe, eight on a ten-point scale, and Plaintiff's fatigue as moderate, four on a ten-point scale.  Tr. at 277.  As a result of Plaintiff's impairments, Dr. McDonnell opined that Plaintiff would be able to sit five hours and stand/walk less than one hour in an eight-hour workday.  Tr. at 277.  Dr. McDonnell recommended Plaintiff get up and move around for ten minutes after sitting for thirty minutes.  Tr. at 277-78.  Dr. McDonnell found Plaintiff could occasionally lift and carry up to ten pounds and was moderately limited in his ability to use his upper extremities.  Tr. at 278-79.  Dr. McDonnell also opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment, but he indicated Plaintiff would be capable of tolerating moderate work stress.  Tr. at 279-80.  Dr. McDonnell believed Plaintiff's pain, fatigue, or other symptoms were frequently severe enough to interfere with his attention and concentration.  Tr. at 280.  Dr.

McDonnell estimated that Plaintiff would likely be absent from work, on average, more than three times a month as a result of Plaintiff's impairments.  Tr. at 281.

### 2.  Dr. Murphy

Plaintiff first visited Dr. Murphy on November 7, 2008, after being referred by Dr. McDonnell due to right low back pain.  Tr. at 288.  Upon review of Plaintiff's MRI and meeting with Plaintiff, Dr. Murphy diagnosed Plaintiff with "[c]hronic fluctuating right low back pain, [p]robable right sacroiliac joint instability, and [d]egenerative disc disease [at] L4-L5 and L5-S1."  Tr. at 288-89 (emphasis omitted).  Dr. Murphy recommended treatment with a sacroiliac joint injection.  Tr. at 289.  On Plaintiff's next visit (December 22, 2008), Dr. Murphy noted that Plaintiff received an SIJ injection from Dr. Free on November 18, 2008, and Plaintiff reported to Dr. Free on December 1, 2008 "that it had been 50% effective."  Tr. at 286.  To Dr. Murphy, Plaintiff indicated that "the efficacy [of the shot] ha[d] persisted."  Tr. at 286.  According to Dr. Murphy's note, Plaintiff was not sure if the relief was due to the injection or the fact that he was no longer working.  Tr. at 286.  Based on Plaintiff's MRI of October 27, 2008, Dr. Murphy agreed with Dr. McDonnell that Plaintiff "should not return to physically intensive work."  Tr. at 286.

The first line of Dr. Murphy's note dated April 9, 2009 states, "This gentleman has had back pain for years and years and years."  Tr. at 486.  On that same date, Dr. Murphy opined that in his experience "a significant, if even temporary benefit, from an SIJ injection, if such is done properly, is diagnostically important."  Tr. at 486.  Plaintiff had "[e]xquisite tenderness to deep palpatation over right SIJ."  Tr. at 486 (emphasis omitted).  His straight leg raises

were negative, his leg strength was normal, and he had "[n]o pain with rotation of the right femur." Tr. at 486. Dr. Murphy planned to refer Plaintiff to Dr. Smith. Tr. at 486.

At another follow-up appointment on June 1, 2009, Dr. Murphy saw Plaintiff and noted, "The patient tells me today that he underwent what sounds like a right sacroiliac arthrogram and CT and block two weeks ago . . . [.] He can't get over how beneficial it has been. He is frankly amazed at the result . . . [.] Pain intensity has reduced from an [eight] to [a three]." Tr. at 485 (emphasis omitted). On examination, Plaintiff sat "comfortably" with "[n]o point tenderness over the right SIJ." Tr. at 485. Additionally, Dr. Murphy noted Plaintiff's leg strength was "normal," Plaintiff stood "erect," and Plaintiff felt "[n]o pain with rotation of either femur or" straight leg raises. Tr. at 485. In Plaintiff's own words, "'[t]he shot helped significantly.'" Tr. at 485.

### 3. Dr. Free

Dr. Free began treating Plaintiff in November 2008 after referrals from Dr. McDonnell and Dr. Murphy. Tr. at 270-73. After examination, Dr. Free diagnosed Plaintiff with "[c]hronic low back pain with lumbar discopathy," "[r]ight sacroiliitis," "[d]epression, and "[o]piate dependence." Tr. at 272. Dr. Free performed a sacroiliac joint injection with arthrography on November 18, 2008, at which time Plaintiff indicated his pain level improved by fifty percent, decreasing from eight to four. Tr. at 269.

At Plaintiff's next follow-up appointment on December 1, 2008, Plaintiff expressed that the injection did not provide him with long-term relief; Plaintiff indicated a pain level of five. Tr. at 267-68. Plaintiff continued to take hydrocodone for pain management. Tr. at 267. On

December 15, 2008, Plaintiff told Dr. Free that he wished to proceed with lumber epidural steroid injections. Tr. at 266.

Plaintiff received epidural steroid injections on December 16, 2008 and January 21, 2009, at levels L5-S1 and L4-L5, respectively.  Tr. at 264-65.  In a treatment note dated February 5, 2009, Dr. Free indicated that the "right SI joint injection provided [Plaintiff] with an approximately 50% reduction in his pain which was relatively short lived." Tr. at 263. The "[i]nterlaminar epidural steroid injections . . . did provide him with resting relief but not when he is doing any intensive lifting."  Tr. at 263. Dr. Free's diagnosis of Plaintiff remained unchanged.  Tr. at 263.

### 4.  Dr. Smith

Upon referral from Dr. Murphy, Dr. Smith began treating Plaintiff on April 20, 2009. Tr. at 337-38.  Similar to Dr. Murphy, Dr. Smith diagnosed Plaintiff with "[d]egenerative disc disease [at] L4-L5 and L5-S1, [with] possible right sacroiliac joint injury."  Tr. at 338.  On June 22, 2009, Dr. Smith performed a medial branch block injection, see Tr. at 333, and Plaintiff reported that the procedure "worked very well and relieved him of his midline backache significantly," Tr. at 334.  Dr. Smith indicated that Plaintiff "completed [a] SF-36 form and this showed that he is still severely limited and can only stand for about 10 minutes and apparently that is due to the pain in his buttock." Tr. at 334.  Dr. Smith considered sending Plaintiff to another physician "to see whether [Plaintiff] can have a minimally invasive treatment."  Tr. at 334.

At Plaintiff's next appointment on September 8, 2009, Plaintiff reported to Dr. Smith that he felt the medial branch block provided him "with some lasting relief," lowering his pain

level between fifty and seventy-five percent.  Tr. at 333.  To Dr. Smith's surprise, Plaintiff even indicated a possible decrease in his buttock pain.  Tr. at 333.  Dr. Smith recognized that Plaintiff did not have insurance, and that Plaintiff "will return to see us when he is ready to go through one of the procedures."[6]  Tr. at 333.

Dr. Smith completed a Lumbar Spine Impairment Questionnaire on October 4, 2010 (approximately thirteen months after his last appointment with Plaintiff).  Tr. at 524-30.  Dr. Smith opined that Plaintiff's prognosis was "poor."  Tr. at 524.  As a result of Plaintiff's impairments, Dr. Smith reported that Plaintiff would be able to sit two hours and stand/walk one hour in an eight-hour workday.  Tr. at 526.  Dr. Smith felt it was necessary that Plaintiff not sit continuously in a work setting and recommended Plaintiff get up and move around every thirty minutes.  Tr. at 527.  Dr. Smith found Plaintiff could occasionally lift and carry up to ten pounds.  Tr. at 527.  Dr. Smith believed Plaintiff's pain frequently interfered with his concentration, and Plaintiff would be capable of tolerating low work stress, basing his opinion on a "[b]rief psychological office questionnaire."  Tr. at 528.  Dr. Smith reported Plaintiff's condition as capable of having "good days" and "bad days."  Tr. at 529.  Dr. Smith estimated that Plaintiff would likely be absent from work, on average, more than three times a month as a result of Plaintiff's impairments.  Tr. at 529.  Dr. Smith placed limitations on Plaintiff's ability to work, including no pushing, pulling, kneeling, bending, or stooping.  Tr. at 529.

---

[6]      It is not entirely clear what procedures to which Dr. Smith was referring.  It is possible that he was referring to one of the procedures referenced in the previous appointment with Plaintiff on July 8, 2009:  Dr. Smith wrote, "I thought we should send [Plaintiff] to Dr. Golavac to see whether [Plaintiff] can have a minimally invasive treatment.  I will bring [Plaintiff] back in two months time.  If his back pain persists and the hospital has got organized we might then be able to carryout ERFR on his facet joints."  Tr. at 334.

On the following day, October 5, 2010, Dr. Smith authored a narrative report regarding Plaintiff's condition.  Tr. at 531-32.  Dr. Smith indicated that although Plaintiff verbalized reduction of pain during his last office visit, Plaintiff indicated he was functioning at thirty-five percent of normal, or sixty-five percent impaired, on a functional questionnaire.  Tr. at 531. Dr. Smith opined that he had "no reason to think [Plaintiff] has improved," but he was "clearly . . . unable to state that Plaintiff is as disabled today as he was when [Dr. Smith] last saw him."  Tr. at 532.  Dr. Smith noted that he had "recommended that [Plaintiff] should be seen by a pain management specialist . . . [but w]hen [Plaintiff] was last seen in September 2009 he had not had this treatment and he told [Dr. Smith] that he did not have insurance in order to see the specialist."  Tr. at 532.  Finally, Dr. Smith opined that he thought Plaintiff's "disability would have lasted for at least 12 months and will probably continue, absent additional treatment."  Tr. at 532.

### b. Non-Examining Physician

One non-examining physician rendered an opinion as to Plaintiff's functioning relevant to the instant matter: Debra Troiano, M.D., a state agency consulting physician.[7]  Dr. Troiano performed a Physical RFC Assessment for Plaintiff on November 25, 2009.  Tr. at 459-66. Dr. Troiano opined that Plaintiff was capable of occasionally lifting twenty pounds, could stand/walk or sit for a total of six hours in an eight-hour workday, and was unlimited in push and pull abilities.  Tr. at 460.  Further, Dr. Troiano reported few postural limitations, finding Plaintiff frequently capable of climbing ramps and stairs, balancing, stooping, kneeling, and

---

[7]        Plaintiff does not challenge the ALJ's finding with respect to Plaintiff's alleged mental health disorders.  The medical opinions in the record relating to Plaintiff's mental health are not discussed herein.

crawling; occasionally capable of crouching; and never capable of climbing ladders, ropes, or scaffolds. Tr. at 461. Dr. Troiano observed no manipulative limitations, visual limitations, or communicative limitations, but did observe an environmental limitation, finding extreme cold may exacerbate Plaintiff's condition and Plaintiff should avoid even moderate exposure. Tr. at 463. Dr. Troiano indicated that other medical conclusions significantly differed from hers, as Plaintiff's treating physicians felt he could not work even though Plaintiff indicated up to seventy-five percent pain relief after his medial branch block and Plaintiff's exam in August 2009 was normal except for mild decreased range of motion of the spine. Tr. at 465.

### 3. ALJ's Findings / Analysis

The ALJ summarized the medical opinions in the record and provided the following weight to each opinion. See Tr. at 27-31. The ALJ assigned "[g]reat weight . . . [to] the reports and opinions of Drs. Free, Murphy, McDonnell, except for Exhibit 4F [the Multiple Impairment Questionnaire dated July 3, 2009], and Smith, except for Exhibits 17 [the Lumbar Spine Impairment Questionnaire dated October 4, 2010] and 18F [the Narrative Report dated October 5, 2010], which have been rejected." Tr. at 27. "Consideration and some weight" were given by the ALJ to the "reports of other treating, examining and non-examining medical sources, such as state consultant reports, that are consistent with the medical evidence of record." Tr. at 27. The ALJ also assigned "some weight" to "non-medical source records, opinions, and testimony that are consistent with the record." Tr. at 27. "[O]pinions and records from any medical source, including state agency medical consultants, that are inconsistent with the medical record" were "given little weight" by the ALJ. Tr. at 27.

As to Dr. Smith, the ALJ recognized the following:

> [Dr. Smith] saw [Plaintiff] on follow-up on 9/8/09 and wrote, "[Plaintiff] has not been to see Dr. Golovac. [Plaintiff] thinks that the medial branch block [done on June 22] has left him with some lasting relief.  [Plaintiff] felt that overall the medial branch block lowered his pain level by something between 50 and 75%. [Dr. Smith] asked [Plaintiff] whether it made any difference to his buttock pain and to [Dr. Smith's] surprise, [Plaintiff] said that is may have, and that while he is aware that rolling over in bed he has pain in the buttock, most of the time, his level of pain has dropped."

Tr. at 28 (quoting Tr. at 488).

As to the Lumbar Spine Impairment Questionnaire completed by Dr. Smith on October 4, 2010, see Tr. at 523-30, the ALJ found the opinion to be "inconsistent with [Dr. Smith's] 9/8/09 progress report," Tr. at 29 (citing Tr. at 488), and he further found it to be "unsupported." Tr. at 29.  The ALJ stated that on October 5, 2010, "Dr. Smith attempt[ed] to shore up his [opinion] of the day before." Tr. at 29.  The ALJ explained that on October 5, 2010, the day after Dr. Smith completed the Lumbar Spine Impairment Questionnaire, Dr. Smith "wrote a summation of his treatment history with [Plaintiff] in which [Dr. Smith] stated that he had not seen [Plaintiff] since 9/09 and he had relied on [Plaintiff's] answers on a functional pain questionnaire indicating he was 65% impaired, which answers were given after [Plaintiff] had made comments to Dr. Smith o[n] 9/8/09 indicating the great relief he had experience from spinal injections." Tr. at 29 (citing Tr. at 531-32).  The ALJ concluded that "the only credible comments made by Dr. Smith in either of these documents are that [Plaintiff] was overweight, still smoking and that he, Dr. Smith, did not know whether [Plaintiff] was disabled as of 10/5/10." Tr. at 29.  According to the ALJ, "[i]t is clear from a reading of these documents that they are inconsistent with one another and are not probative of the issues." Tr. at 29.  The ALJ "reject[ed]" those opinions of Dr. Smith.

Regarding Dr. McDonnell's opinion, the ALJ noted that Dr. McDonnell completed a "Multiple Impairment Questionnaire on or about 6/24/09 regarding [Plaintiff's RFC]."[8] Tr. at 28 (referring to Tr. at 275-82).  The ALJ recognized that parts of that form are "illegible."  Tr. at 28.  Overall, the ALJ found Dr. McDonnell's 6/24/09 opinion to be "inconsistent with that of neurosurgeon Dr. Murphy."   Tr. at 28.   The ALJ concluded that "[a]lthough [Dr. McDonnell's opinion] demonstrates [Plaintiff's] capacity for some elements of a sedentary [RFC], the opinion is given little weight."  Tr. at 28.

The opinion of Dr. Murphy that the ALJ contrasted with Dr. McDonnell's opinion was rendered on June 1, 2009 (about one month before Dr. McDonnell's opinion).  The ALJ recognized that on June 1, 2009, Dr. Murphy noted that "[Plaintiff couldn't] get over how beneficial [the right sacroiliac athrogram, CT, and block procedure had] been.  [Plaintiff was] frankly amazed at the result.[]  Pain intensity reduced from an [eight] to a [three]."  Tr. at 28 (referring to Tr. at 381, 485 (duplicate)).  The ALJ also stated that "[o]n examination[,] Dr. Murphy reported [Plaintiff] sat comfortably with no tenderness over his sacroiliac joint[, t]here was no pain on rotation, or straight leg raise testing[, and h]is leg strength was normal and he stood erect."  Tr. at 28  (referring to Tr. at 381, 485 (duplicate)).  The ALJ additionally noted that Plaintiff told Dr. Murphy that "'the shot helped significantly.'"  Tr. at 28 (quoting Tr. at 381, 485 (duplicate)).

---

[8]        It appears that Dr. McDonnell dated the form July 3, 2009, Tr. at 282, and he indicated on the form that the date of his most recent examination of Plaintiff was June 24 ,2009, Tr. at 275.

Finally, pertinent to Plaintiff's issue, the ALJ summarized Dr. Troiano's Physical RFC Assessment.[9] See Tr. at 28-30. The ALJ stated that according to Dr. Troiano, Plaintiff "was capable of light work, with minor postural and environmental limitations." Tr. at 30 (referring to Tr. at 459-66). The ALJ concluded that Dr. Troiano's opinion "is probative of [Plaintiff's] medical issues and is given some weight." Tr. at 30 (citing Tr. at 459-66).

Upon review, the undersigned finds the ALJ's reasons for discrediting and/or rejecting the opinions of Dr. Smith and Dr. McDonnell amount to the requisite "good cause." See Lewis, 125 F.3d at 1440. The ALJ's reasons are accurate and supported by substantial evidence. The undersigned further finds the ALJ's assignment of "some weight" to Dr. Troiano's opinion was reasonable and supported by substantial evidence. It is not the job of this Court to reweigh the evidence. See, e.g., Cornelius, 936 F.2d at 1145. The ALJ's findings will not be disturbed.

## B. Plaintiff's Credibility

Plaintiff challenges the ALJ's credibility finding. See Pl.'s Mem. at 15-18. Plaintiff contends that "the ALJ applied the wrong legal [standard] in making his credibility determination." Id. at 16. In that respect, Plaintiff states that the ALJ's inclusion of the boilerplate language that Plaintiff's statements "were not credible to the extent they are inconsistent with the [ALJ's RFC] assessment," is a misapplication of the Regulations, because the Regulations require an ALJ "to compare [a] claimant's testimony against the evidence of record" rather than comparing it to the ALJ's RFC assessment. Pl.'s Mem. at

---

[9] The ALJ did not refer to Dr. Troiano by name. See Tr. at 28-29. The ALJ cited to Exhibit 12F, that is Dr. Troiano's Physical RFC Assessment. See Tr. at 459-66. By the ALJ's citation and summary of the Exhibit, it is clear he was referring to Dr. Troiano's opinion.

16-17 (internal quotation marks omitted from first quotation).  Plaintiff refers to his first issue on appeal and argues that the alleged misapplication of the law is "particularly problematic, when as here, the ALJ compares [Plaintiff's] testimony against an RFC that is not supported by substantial evidence in the record." Id. at 17. Additionally, Plaintiff asserts that the ALJ's summary of Plaintiff's daily activities "is a significant gloss on [Plaintiff's] testimony regarding [those] activities." Id.

### 1.  Law Regarding Credibility Assessments

"[T]o establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." Holt, 921 F.2d at 1223.

"[C]redibility determinations are the province of the ALJ." Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005).  The ALJ "must articulate explicit and adequate reasons" for finding a claimant "not credible." Wilson, 284 F.3d at 1225.  "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications[;] and (5) treatment or measures taken by the claimant for relief of symptoms."

Davis v. Astrue, 287 F. App'x 748, 760 (11th Cir. 2008) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)).  After considering the claimant's subjective complaints, "the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).

### 2.  ALJ's Findings / Analysis

The ALJ indicated that "[i]n determining that [Plaintiff] is not credible to the extent that he is disabled," Tr. at 27, the ALJ considered the medical opinions of record as summarized above and Plaintiff's testimony at the hearing, Tr. at 27-30.  As to Plaintiff's hearing testimony, the ALJ recognized Plaintiff's testimony that he can prepare "simple microwave meals, but does not cook[ or] load the dishwasher."  Tr. at 27.  The ALJ noted Plaintiff's testimony that "[h]e goes to AA once a week[, and that f]riends visit with him and his parents."  Tr. at 27.  The ALJ recognized that through the Summer of 2010, Plaintiff liv[ed] alone, clean[ed] his house, including vacuuming, and mowed the yard.  Tr. at 30.  The ALJ further noted Plaintiff testified that he "drove half the distance to North Carolina, [and he can] lift and carry an 18-pound bag of kitty litter[,]" Tr. at 30, but "[l]ifting 10 to 18 pounds causes low back pain," Tr. at 27 (summarizing Plaintiff's testimony at the hearing).  The ALJ observed that Plaintiff "sleeps 14 hours a night[,]" Tr. at 27, and that he "sleeps well despite allegations of pain[,]" Tr. at 30.  The ALJ further noted that Plaintiff has a "good ability to concentrate [which] is demonstrated by his watching the hour-long detective crime television show, CSI."  Tr. at 30.

The ALJ found that "[t]hese activities indicate that [Plaintiff] has a wide range of capabilities."  Tr. at 30.  The ALJ "conclude[d] that the evidence as a whole shows that [Plaintiff's] assertions as to the severity of his impairments are not credible to the extent that he is disabled.  In fact, the evidence shows that he retains the capacity for less than a full range of sedentary exertion, consistent with his [RFC]."  Tr. at 31.

Upon review of the record and consideration of the ALJ's Decision with respect to Plaintiff's credibility, the undersigned finds that the ALJ articulated "explicit and adequate reasons" for discrediting Plaintiff's testimony.  Wilson, 284 F.3d at 1225.  Those reasons are supported by substantial evidence.  The undersigned also finds that the ALJ applied the appropriate legal standard.[10]  As with the first issue, no error is found here.

### V. Conclusion

After a thorough review of the entire record, it is

**ORDERED**:

1.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **AFFIRMING** the Commissioner's final decision.

---

[10]      In support of the argument that the ALJ applied the incorrect legal standard, Plaintiff relies on non-binding authority from the United States Court of Appeals for the Seventh Circuit.  See Pl.'s Mem. at 17 (citing Bjornson v. Astrue, 671 F.3d 640, 645-46 (7th Cir. 2012); Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012)).  In addition to the fact that these cases are not binding on this Court, the court in Bjornson found the substance of the ALJ's credibility determination to be erroneous.  Bjornson, 671 F.3d at 646-49.  Here, the ALJ's reasons are adequate and supported by substantial evidence.

2.      The Clerk of Court is further directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida on March 26, 2014.


*James R. Klindt*
**JAMES R. KLINDT**
United States Magistrate Judge


cn
Copies to:
Counsel of Record